UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

STEVEN DUNCAN, PETER CAHILL and
CHARLES CAPARELLI, Individually and on
Behalf of All Others Similarly Situated,

                            Plaintiffs,

      vs.

JOY GLOBAL INC., EDWARD L. DOHENY
II, JOHN NILS HANSON, STEVEN L.
GERARD, MARK J. GLIEBE, JOHN T.
GREMP, GALE E. KLAPPA, RICHARD B.
LOYND, P. ERIC SIEGERT and JAMES H.
TATE,

                          Defendants.

Civil No. 2:16-cv-01229-PP

<u>CLASS ACTION</u>

<u>DEMAND FOR JURY TRIAL</u>

---

AMENDED COMPLAINT FOR VIOLATIONS OF §§14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934

---

Lead Plaintiffs Steven Duncan, Peter Cahill and Charles Caparelli ("plaintiffs"), individually and on behalf of all others similarly situated, respectfully bring this direct class action complaint for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder against the herein named defendants and allege the following:

## SUMMARY OF THE ACTION

1.      This is a direct stockholder class action brought by plaintiffs on behalf of the holders of Joy Global Inc. ("Joy Global" or "Joy" or the "Company") common stock against Joy Global and its Board of Directors (the "Board") for violations of federal law arising out of the sale of Joy Global to Komatsu Ltd. ("Komatsu") (the "Acquisition" or the "Merger"). This matter arises out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

2.      Prior to the Acquisition, Joy Global was a leading provider of advanced equipment, systems, and direct services for the global mining industry. On July 21, 2016, defendants announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Komatsu would purchase all of Joy Global's outstanding shares for the inadequate price of $28.30 per share, or approximately $3.7 billion total.

3.      The announcement was not well received. On July 25, 2016, the wealth management firm Robert W. Baird & Co. Inc., also headquartered in Milwaukee, reported that the $28.30 per share price drastically undervalued the Company: "the value of the transaction, which boils down to **$28.30** (per share), effectively *does not extract as much value as there should be for Joy's shareholders. In our view, something closer to $40, frankly above $40, would accomplish that*. . . . [Joy Global] is one of the most valuable assets, pure play mining assets, available globally." Similarly, *Bloomberg* reported that Komatsu was buying Joy Global "*[o]n the cheap*" by acquiring "Joy at almost a *50 percent discount to its five-year average*. And now [Komatsu] has the benefit of at least some stabilization in commodity prices to give it confidence in a mining turnaround. Joy Global shares have recovered somewhat this year, but *Komatsu is still getting a bargain*. In other

words, the timing probably couldn't have been better for Komatsu to strike its biggest deal yet." The day after the Acquisition announcement, July 22, 2016, the *Milwaukee Business Journal* ran a story titled, "Joy Global sale another blow to Milwaukee economy, charities."

4.     Under pressure from stockholders, analysts, and the local community, on September 2, 2016, defendants issued a materially false and misleading Definitive Proxy Statement on Schedule 14A (the "Proxy") in order to secure shareholder support for the undervalued Acquisition. The Proxy, which recommended that Joy Global's shareholders vote in favor of the Acquisition, omitted and misrepresented material information in contravention of §§14(a) and 20(a) of the 1934 Act regarding the unfair consideration offered in the Acquisition and the actual intrinsic value of the Company. Defendants were forced to issue multiple supplemental Proxy disclosures on September 29 and October 3, 2016 in an attempt to rectify the problems, but the final Proxy still woefully failed to provide full and fair disclosures to Joy Global stockholders.

5.     When stockholders are forced to decide whether to accept a sum certain value in a cash-out merger, there is no more material information than management's estimates of the standalone corporation's future cash flows. In such a situation, investors are concerned, perhaps above all else, with the expected corporate cash flows if the sale is not approved. A common refrain throughout case law states that "projections . . . are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or . . . market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." In the context of a corporate sale, a company's operational, run-the-company projections prepared before the acquirer's initial offer – thus untainted by the omnipresent specter of management conflict in a change-of-control transaction – are sacrosanct.

6.     When submitting the Acquisition to a stockholder vote here, however, the Joy Global Board deprived the Company's stockholders of management's most reasonable, reliable, and best estimates of Joy Global's future prospects. In the ordinary course of business, Joy Global prepared a detailed five-year plan, which Joy Global CEO Edward L. Doheny II ("Doheny") repeatedly touted throughout 2015 and early 2016 as the Company's long-term "strategy," its "five-year plan [for] growth," and its "five-year plan on operational strategies." The Proxy concealed the numerical

- 2 -

details of this operational growth plan from stockholders.  Instead, in the Proxy, Joy Global presented its stockholders with an unduly pessimistic, downward-revised set of numbers that contradicted management's repeated and numerically specific statements regarding the Company's future growth.  Management did not create these new, downward projections until after Komatsu submitted an offer set to trigger millions in personal golden parachute compensation for Doheny and his senior management team, which renders the downside adjustments inherently unreliable.  As further described in detail below, the new downside scenario was also numerically incompatible with the Company's operative reality and then-current expectations, as repeatedly touted by Doheny.

7.     As a result of the misleading Proxy, uninformed Joy Global stockholders voted in favor of the Acquisition on October 19, 2016.  Based on the misleading Proxy with respect to the Company's intrinsic value, defendants were able to obtain shareholder approval of the sale to Komatsu and deprive Joy Global shareholders of the full value of their interests in the Company.  The preparation and dissemination of the false and misleading Proxy thus induced shareholder action which resulted in substantial harm to plaintiffs and Joy Global's other shareholders.  At the same meeting, however, Joy Global stockholders voted against "certain compensation that may be paid or become payable to [Joy Global] named executive officers in connection with the [M]erger."

8.     The Acquisition closed on April 5, 2017.  On that date, Joy Global ceased public trading and became a wholly owned subsidiary of a Komatsu affiliate.  Also on that date, Doheny received over $22.2 million in cash payments related to the Acquisition, which Joy Global stockholders had just voted to reject.  Because the stockholder vote on Doheny's Acquisition-related executive compensation was "non-binding," however, the Board flouted the vote and caused Doheny to receive that full amount.  Joy Global was founded in 1919 and its corporate roots date back to Milwaukee in 1884.  Yet after that final act of self-dealing by the Board on April 5, 2017, the day that Joy Global ceased trading as a public company, the *Milwaukee Business Journal* ran the following headline:  "***CEO Doheny, top execs out at Joy Global, set to receive golden parachute payment***."  Komatsu promptly renamed Joy Global as Komatsu America Corp.

1258258_1

9.     This action seeks damages on behalf of Joy Global's shareholders, incurred as a result of defendants' materially misleading Proxy submitted in contravention of §§14(a) and 20(a) of the 1934 Act.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

11.     Venue is proper in this District because Joy Global had its principle place of business in this District at 100 East Wisconsin Avenue, Suite 2780, Milwaukee, Wisconsin. Plaintiffs' claims arose in this District, where most of the actionable conduct has taken place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, the Individual Defendants (as defined below), as Company officers and/or directors, have extensive contacts with this District.

## PARTIES

12.     Plaintiffs Steven Duncan, Peter Cahill and Charles Caparelli were shareholders of Joy Global.

13.     Defendant Joy Global was a Delaware corporation headquartered in Milwaukee, Wisconsin.

14.     Defendant Edward L. Doheny II was President, CEO, and a director of Joy Global at all relevant times, including the Acquisition.

15.     Defendant John Nils Hanson ("Hanson") was Non-Executive Chairman and a director of Joy Global at all relevant times, including the Acquisition. Hanson received $228,164 upon consummation of the Acquisition.

16.     Defendant Steven L. Gerard was a director of Joy Global at all relevant times, including the Acquisition.

17.     Defendant Mark J. Gliebe was a director of Joy Global at all relevant times, including the Acquisition.

- 4 -

18. Defendant John T. Gremp was a director of Joy Global at all relevant times, including the Acquisition.

19. Defendant Gale E. Klappa was a director of Joy Global at all relevant times, including the Acquisition.

20. Defendant Richard B. Loynd was a director of Joy Global at all relevant times, including the Acquisition.

21. Defendant P. Eric Siegert was a director of Joy Global at all relevant times, including the Acquisition.

22. Defendant James H. Tate was a director of Joy Global at all relevant times, including the Acquisition.

23. The defendants named above in ¶¶14-22 are sometimes collectively referred to herein as the "Individual Defendants" or the "Board."

24. The Individual Defendants other than Doheny are sometimes collectively referred to herein as the "Outside Directors."

25. Each of the defendants participated in the preparation, review and dissemination of the materially false and misleading Proxy complained of herein. The Individual Defendants abdicated their obligation to Joy Global and its shareholders to file and distribute to plaintiff and the class a Proxy Statement that was not false and misleading.

## FACTUAL ALLEGATIONS

### Background of the Companies

26. Founded by Joseph Joy in 1919, Joy Global was a leading manufacturer and servicer of high productivity mining equipment for the extraction of metals and minerals. Joy Global manufactured and marketed original equipment and parts and performed services for both underground and surface mining, as well as certain industrial applications. Joy Global's equipment was used in major mining regions throughout the world to mine coal, copper, iron ore, oil sands, gold and other minerals and ores. The crown jewel of Joy Global's growth strategy was its service offerings. Joy Global offered comprehensive direct service, which included smart service offerings

near major mining regions worldwide, and Joy Global provided extensive operational support for many types of equipment used in mining.

27.     Established in 1921 and based in Tokyo, Japan, Komatsu is a diversified provider of industrial-use products and services. While primarily engaged in the manufacture of equipment used in international construction and mining, Komatsu is also involved in other business, such as industrial machinery and vehicles, logistics, electronics and other solutions-based operations.

**Chronology of Joy Global Management's Five-Year Growth Plan**

28.     In the ordinary course of business, Joy Global prepared detailed five-year projections, which formed the bases of Joy Global's representations to the market about the Company's impressive prospects. Indeed, during investor calls and conferences, Doheny repeatedly referred to the Company's internally kept long-term "strategy," its "five-year plan [for] growth," and its "five-year plan on operational strategies." Joy Global used these growth projections to run the Company throughout 2015 and the first half of 2016 without any doubt as to the appropriateness of the assumptions underlying the projections.

29.     For example, on June 11, 2015, Doheny gave a presentation at the 2015 William Blair Annual Growth Stock Conference entitled, "Creating Long Term Value for Shareholders." The day prior, June 10, 2015, Joy Global's stock price closed at *$40.20 per share*. Doheny's presentation contained the following slide:

1258258_1

## Strategies: Creating Growth

**Direct Service Growth: ~ $500M**
Investment in service facilities
Joy branded consumables
Increased capture rate on installed base



**Underground Hard Rock: ~ $600M**
MTI & Montabert Acquisitions
Transformational Mechanical Cutting
Expanded markets & share gain


**JOY**GLOBAL
**Service Leader**

**China Domestic Market: ~ $200M**
Injecting Joy technology; full-system solutions
Differentiated products drive share gain

 



| 2015 Guidance[1] | | → | Potential Value of Growth Strategies | |
|---|---|---|---|---|
| Revenue: | EPS: | | Revenue: | EPS: |
| ~$3.3B | ~$2.50 | | ~$4.8B | ~$5.50 |

**New Product Development: ~$200M**

  

**Footprint Optimization Beyond '15: ~ $60M[2]**
Leverage low-cost footprint & Supply Chain
Improve manufacturing utilization



Company unique growth strategies could generate incremental revenues and
adjusted EPS of $1.5 billion and $3.00 respectively over the next 5 years

1: As of June 4, 2015 company expects to be at the low end of guidance range of $3.3B to $3.6B sales and $2.50 to $3.00 adjusted EPS
2: ~$6M of savings included in 2015 guidance

17    June 2015    William Blair – 2015 Annual Growth Stock Conference


**JOY**GLOBAL
© 2015 Joy Global Inc. All rights reserved

30.     When describing that exact slide at the William Blair conference on June 11, 2015,

Doheny stated as follows:  *"So – and **this is a five-year plan.**  Putting this next to the acquisitions

we made, pretty excited about what that means."*  The question and answer session included the

following exchange regarding this slide:

> Q – Larry T. De Maria:  . . .  Also, would these be considered kind of 2020 targets or
> sooner?  Are they three-year to five-year?
>
> A – Edward L. Doheny:  Five year.
>
> Q – Larry T. De Maria – Five-year targets, okay.  And then on the service side,
> captive rate – what's the captive rate?  Should we have to go from say 60% to 75% to
> get there?
>
> *             *             *
>
> A – Edward L. Doheny – ***The service capture rate we think we can get more with
> the ramp up to 65% to 70%***.  It's not a precise, because we have different products
> with different market share.  I'll give you an example of one.  If you look at the mine
> map that I have up on the screen, if you look at our longwall, those who know our
> business well, we had a strong presence in the room and pillar. . . .  Our market

Case 2:16-cv-01229-PP   Filed 04/26/17   Page 8 of 41   Document 33

capture in the AFC was low. So as we put in new technology, one being quick for some faster customer, we think we can move that one up significantly.

The second side of the market, the capture rates[,] the new stuff on consumables. *We think we can actually double our penetration on consumables over the next five years, same thing*. A consumable would be the teeth on a shovel the ground engagement teeth, just to give you an example how important as you see the big shovels in the drive line.

31.     The above-pictured slide, which Doheny described as Joy Global's "five-year plan," reflects, at a high-level, what Doheny would reference on other analyst calls and conferences as Joy Global's five-year "strategy," its "five-year plan [for] growth," and its "five-year plan on operational strategies." While the language in the slide above was couched in phrases such as "potential value" and "could generate," these numbers, according to Doheny, were backed by detailed underlying projection models.

32.     The financial figures in the above slide are illuminating. The incremental revenues of $1.5 billion, on top of the then-expected $3.3 billion in Fiscal Year ("FY") of 2015 revenues, represented a *projected $4.8 billion in revenue in 2020*. The incremental Earnings Per Share ("EPS") of $3.00 per share, on top of the then-expected $2.50 in 2015 EPS, represented a *projected $5.50 EPS in 2020*. Joy Global represented that such statements, while forward looking, "*are based on our current expectations*."

33.     Two months later, on September 3, 2015, Doheny again publicly touted Joy Global's existing "five-year plan," both regarding "growth" of "new products" as well as an existing "five-year plan on operational strategies [and] facilities." Doheny stated regarding the five-year plan pictured above:

> *The good news is we have a line of sight to do it. We take it very seriously that we are ahead of markets that move in front of us. <u>So we have a five-year plan on growth that I talk a lot about on the new products, but we also have a five-year plan on our operational strategies and what we're doing with the facilities around the world</u>*.

34.     During this time, the global mining and commodities markets were softening. The following week, on September 9, 2015, Doheny gave a presentation at the RBC Capital Markets 2015 Global Industrials Conference, also entitled "Creating Long Term Value for Shareholders." Doheny's presentation contained updated slides describing the reduced macroeconomic and mining

industry outlook entitled, "2015 Global Economic Outlook Reduced," "US Coal: Landscape Under Increasing Pressure," and "ROW [Rest of World] Coal Markets Strained." As a result, Joy Global management took into account all of those factors, and updated the figures underlying the five-year plan. Doheny presented the following slide, incorporating those updates:



35.     In light of the softening markets, between June and September 9, 2015, Joy Global had revised its outlook for FY 2015, from an expected $3.3 billion to $3.1 billion in revenue and from $2.50 to $1.80 in EPS. Joy Global updated its five-year plan concurrently. As a result, in the above-pictured slide, the incremental revenues of $1.5 billion, on top of the then-expected $3.1 billion of 2015 revenues, represented a projected **$4.6 billion in revenue in 2020**. The incremental EPS of $3.00 per share, on top of the then-expected $1.80 in 2015 EPS, represented a **projected $4.80 EPS in 2020**. Joy Global again represented that such statements, while forward looking, "**are based on our current expectations**." Thus, the five-year plan did not represent an aggressive "best case" scenario, rather, management moderated the plan to track with updated information as it came in.

1258258_1

36. On November 10, 2015, Doheny gave a presentation at the Baird 2015 Industrial Conference, again entitled "Creating Long Term Value for Shareholders." Doheny's presentation contained the same "Strategies" slide as September, but now updated with a new title, "Creating Growth in a Down Market":



37. Joy Global retained the same outlook for FY2015 results as the September 9th presentation. As a result, in the above-pictured slide, the incremental revenues of $1.5 billion, on top of the then-expected $3.1 billion of 2015 revenues, continued to represent a projected ***$4.6 billion in revenue in 2020***. The incremental EPS of $3.00 per share, on top of the then-expected $1.80 in 2015 EPS, continued to represent a projected ***$4.80 EPS in 2020***. Joy Global again represented that such statements, while forward looking, "***are based on our current expectations***."

38. On December 16, 2015, Joy Global reported better than expected FY2015 results, including FY2015 total net sales by product (revenues) at $3.172 billion. Joy Global reported FY2015 Fully Diluted EPS at $1.95. When discussing the "Company Outlook," Doheny stated that despite the weakness in near-term commodity pricing and global mining capital expenditures, the growth plan remained intact:

> With global mining capital expenditures expected to step down again in 2016, we remain intensely focused on cost reduction and cash generation. . . . We exceeded our cost reduction targets again in 2015 and are proactively taking actions to achieve another $85 million of cost reductions in 2016. Our cash generation in the

fourth quarter was strong and was driven by good results in bringing our inventory in closer alignment with current order levels. We believe there are additional opportunities to structurally reduce inventories in 2016 by leveraging our global supply chain and the recent investments we have made in our service network.

*We will also continue to drive our growth strategies with service, new product development and expansion of our hard rock platform*. While adoption rates are slowed by current market conditions, we have expanded our design capabilities to deliver value-added, new Joy branded service products and consumables to our customers and are well positioned to drive growth in this area in the future. *Our hybrid excavator, underground hard rock loader and prototype hard rock mechanical cutting machine are all currently operating and proving out their capabilities with customers in the field. These organically developed new products in combination with the recent acquisitions and our global service network will enable us to drive growth in current and adjacent markets in the future*.

We are controlling the things we can, and are confident our strategies and operational execution will position us well for the future, but the state of our end markets sets up another challenging year in 2016 with revenue expected to be $2.4 billion to $2.6 billion and adjusted earnings per diluted share in the range of $0.10 to $0.50.

39. Just two days later, on December 18, 2015, Doheny presented a "Company Update," entitled "Creating Long Term Value for Shareholders." Joy Global management included a similar slide as before, again titled, "Strategies: Creating Growth in a Down Market":



40.     By doing so, Doheny confirmed that the underlying five-year plan, while updated, remained directionally intact – the estimated added value for Direct Service Growth ($500 million), New Product Development ($200 million), China & High Growth Markets ($200 million), Hard Rock ($600 million) retain the same projected outlook as the September 2015 presentation.

41.     In that December presentation, Joy Global included its reported results for FY 2015: revenue of $3.2 billion and EPS of $1.95.  Both figures were up from the September 9, 2015 presentation.  Applying the growth numbers contained in that slide shows that Joy Global projected incremental revenues of $1.5 billion, on top of the reported $3.2 billion of 2015 revenues, at ***$4.7 billion in revenue in 2020***.  The incremental EPS of $3.00 per share, on top of the then-expected $1.95 in 2015 EPS, represented a ***projected $4.95 EPS in 2020***.  Joy Global represented that such statements, while forward looking, "***are based on our current expectations***."  These five-year projections thus represented what management reasonably believed Joy Global would be able to achieve over the next five years.

**Joy Global Receives an Offer from Komatsu and**
**Internally Discusses Two Five-Year Projection Scenarios**

42.     On February 23, 2016, following an initial meeting with Doheny, Komatsu sent a proposal to purchase Joy Global for just $17.00 per share in cash.  The Joy Global Board set a meeting to discuss the proposal on March 7, 2016.

43.     In the meantime, the Company continued to tout its long-term growth prospects.  On February 25, 2016, after a proxy advisory service balked at the Board's decision to increase Doheny's compensation, Joy Global issued a statement defending Doheny's raise in a softening global mining market:

> Although our share price has been depressed along with an industry trend, our executives have pushed the company forward and kept us competitive by taking a number of proactive measures to maintain liquidity and position the company for growth once market conditions improve.  These actions have included reducing costs in excess of our targets every year since 2013, including by accelerating our facility optimization plans, managing our trade working capital and keeping tight control of capital expenditures.  ***These actions have driven stable cash flows through the commodity market down cycle.  At the same time, we have taken actions to position our business for long-term, profitable growth***.  This included our 2015 acquisition of Montabert S.A.S., which built upon our 2014 acquisition of Mining Technologies Inc. to provide an expanded platform for our hard rock mining product offerings, and continued product development outside of our traditional markets.  ***We have met key***

*milestones in our product development efforts. We remain focused on driving long-term performance through our industry-leading network and differentiating our product and service offerings based on technology, controls and automation*.

44.     At the March 7, 2016 Board meeting, Joy Global management, led by Doheny, presented two five-year models to the Board. The Company's bankers from Goldman, Sachs & Co. ("Goldman") also attended the meeting. The Proxy misleadingly states that "members of senior management discussed with the board *certain high-level, preliminary financial cases* for the future performance of the business representing Joy Global's standalone plans under two different scenarios." With respect to the second growth-related "scenario," there was nothing "high-level" or "preliminary" about it. Doheny had touted the same plan for months, long describing that existing projection model as a "five-year plan" regarding "growth" and "operational strategies."

45.     The Proxy describes the two March 7, 2016 projection models as follows:

The first scenario presented at the meeting reflected a slow recovery in the coal mining industry and Joy Global's businesses potentially reaching the low point of the cycle in 2017, and the second reflected a more robust recovery. In particular, the first scenario assumed that the prices for the commodities that impact Joy Global's businesses would decline substantially in 2016 before slowly recovering from 2017 through 2021, and sales in the hard rock and industrial market would grow at a significantly stronger rate over that period.

The second scenario, by contrast, assumed that the prices for the commodities that impact Joy Global's businesses would decline much less significantly in 2016, with a slightly stronger recovery than in the first scenario from 2017 through 2021, and that as compared to the first scenario the sales growth over that period would be slightly higher in the hard rock and industrial market but significantly stronger in service products.

46.     The broad description of the "second scenario" directionally matches up with the five-year plan that Doheny repeatedly touted in the preceding months.

47.     Note that the first scenario contains no emphasis on service products, the crown jewel of Joy Global growth strategy, as discussed below. As also discussed below, the Proxy discloses the numerical projections for the "first scenario" (the "Five-Year Downside Scenario"), while concealing the numerical projections for the "second scenario" (the "Five-Year Growth Plan"). At the March 7, 2016 meeting, the Board failed to discuss the fact that Doheny had repeatedly presented the Growth Five-Year Plan as *the* strategic standalone plan for Joy Global through 2020.

- 13 -

48.     Doheny knew that Joy Global remained on track to achieve the Five-Year Growth Plan even after March 7, 2016.  How do we know this?  Because Doheny went back out to the market and touted the same plan eleven days later.  But Doheny also knew that the Five-Year Growth Plan would have to be revised downward and moderated in order for an acquisition by Komatsu to appear fair from a financial perspective to Joy Global's shareholders.  The problem for Doheny was that, even in June 2016, Joy Global exceeded its own goals and reported that "our bookings and financial results in the second quarter were better than expected. . . .  We secured a couple of nice growth-related equipment bookings in the quarter and saw sequential improvement in earnings, in part due to continued execution on our cost reduction initiatives."

**Doheny Again Touts the Five-Year Growth Plan to the Market**

49.     On March 16, 2016, Doheny presented at the Bank of America Merrill Lynch 2016 Global Industrials & EU Autos Conference.  The first slide of his presentation was entitled, "Creating Long Term Value," explaining that despite the low commodity prices, "Longer-term industrialization and urbanization of emerging markets remains intact."  Joy Global again included a high-level slide based on the Five-Year Growth Plan:



1258258_1

50.     While Doheny eliminated the numerical increases for the specific growth planks – Direct Service Growth, China & High Growth Markets, New Product Development, Hard Rock & Industrial Minerals, and Footprint Optimization Beyond '16 – the slide's concluding statement continues to references the same "incremental revenues and adjusted EPS of $1.5 billion and $3.00 respectively over the next 5 years." Thus, applying the numbers contained in that slide to then completed FY2015 revenue and FY2015 EPS shows that Joy Global management continued to project incremental revenues of $1.5 billion, on top of the reported $3.2 billion of 2015, resulting in a projected ***$4.7 billion in revenue in 2020***. The incremental EPS of $3.00 per share, on top of the reported $1.95 in 2015 EPS, represented a projected ***$4.95 EPS in 2020***. Joy Global again represented that such statements, while forward looking, "***are based on our current expectations***." These statements are irreconcilable with the Five-Year Downside Scenario described that the March 7, 2016 meeting above.

51.     On March 30, 2016, Komatsu sent Joy Global a second non-binding proposal, raising the price to $23.00 per share. Despite the plain inadequacy of the $23.00 per share offer price, Doheny provided Komatsu with significant due diligence, including in-person meetings with Joy Global's senior management team in Chicago on May 1 and May 2, 2016. Apart from Doheny, no Board member attended to supervise. Joy Global offered no other potential acquirer the chance to participate in any due diligence session before the close of the Acquisition the following year.

**In Early June 2016, Joy Global Reports Better than Expected**
**Results and Doheny Confirms the Growth Plan Is Intact**

52.     On June 2, 2016, Doheny and James M. Sullivan, the Company's CFO, held an earnings call to discuss Joy Global's latest financial results. Doheny opened his remarks by stating: "Despite ongoing challenges in commodity markets, ***our bookings and financial results in the second quarter were better than expected. We secured a couple of nice growth-related equipment bookings in the quarter and saw sequential improvement in earnings, in part due to continued execution on our cost reduction initiatives***. Additionally, our keen focus on managing trade working capital resulted in another solid quarter of cash generation." The Company's earnings release also contained a statement from Doheny confirming that Joy Global was "able to secure

- 15 -

growth-related original equipment bookings in a few markets during the quarter. In addition, a seasonal up-tick in service sales and continued cost reduction initiatives helped drive sequentially improved earnings and continued solid cash generation in the quarter." Doheny further stated:

> Our global teams continued to demonstrate their resiliency driving cost reduction and cash from working capital while advancing our key growth strategies. . . . Driving our strategies and demonstrating the superior differentiation of our products and service offerings remains key to our long-term growth. This strategy has led to successes with our new product development programs as well as our hard rock and consumables market penetration and will position us well when markets begin to recover.

53. Regarding the longer-term outlook, Doheny again reiterated that the Company's growth plan was strong and specific aspects were "on schedule":

> ***We continued to meet key milestones on our new products. The hybrid excavator has been in full mining production mode for nearly a quarter and is meeting or exceeding all key performance metrics***. It's generating great excitement in the industry as the fuel savings combined with the efficiencies of an electric mining shovel are causing many of our customers to view this as an alternative with a competitive advantage to their existing hydraulic excavator fleet. ***While industry acceptance and critical mass remain key, we believe this product is on schedule and represents a $300 million to $400 million opportunity over the next several years***.

54. While headwinds existed, Joy Global reaffirmed the strength of its Five-Year Growth Plan. Externally, the Five-Year Growth Plan remained viable. Internally, however, management slashed the plan, solely to support the upcoming fairness opinion on a sale.

**Doheny Chooses the Downside Growth Scenario on June 6, 2016, in Contrast to His Public Statements the Previous Week**

55. The Board held a meeting on June 6, 2016. At this point, Komatsu's proposal stood at $24.50 per share. After touting a growth-related Company to the market for months, Doheny pounced on the opportunity to cash in his shares and exercise his golden parachute. At that June 6, 2016 meeting, Doheny buried the Five-Year Growth Plan and instead presented the Five-Year Downside Scenario to the Board, this time with additional detail.

56. A number of items regarding this meeting stand out. First, the projections Doheny presented at this meeting were directionally identical to the Five-Year Downside Scenario he had shown the Board back on March 6, 2016. Thus, apart from filling in additional detail, the Five-Year Downside Scenario remained directionally static since its genesis in March 2016 (after Komatsu had

- 16 -

submitted an acquisition proposal).  Second, a later-filed Proxy Supplement states that the exact same Five-Year Downside Scenario presented at the June 6, 2016 meeting was recycled in Goldman's July 20, 2016 Fairness Opinion and again to stockholders in the September 2, 2016 Proxy.  Third, at this meeting, without reviewing a valuation on the Five-Year Growth Plan – and thus without understanding the value of the Company's operative strategic plan – the Board actually decided to sell the Company to Komatsu pending further negotiations.

**Unlike the Downside Scenario, the Five-Year Growth Plan**
**Was Reasonable and Reflected the Company's Operative Reality**

57.     The Five-Year Growth Plan represented management's reasonable expectations and views regarding Joy Global's future financial performance.  In contrast, the Five-Year Downside Scenario was misleading as to Joy Global management's true views of the Company's prospects. Remarkably, unlike most other sellside merger proxy statements, these defendants did not affirmatively represent that the Five-Year Downside Scenario was a reasonable or good faith view of the Company's five year strategy or business plan.  ***Indeed, the Joy Global Board disclaimed even the "validity" of the Five-Year Downside Scenario***, stating in the Proxy:  "None of the Joy Global board, Joy Global, Goldman Sachs, or any of Joy Global's and Komatsu's affiliates assumes any responsibility for the validity, accuracy or completeness of the Joy Global Forecasts."  In contrast, a more reliable and "valid" plan existed – the Five-Year Growth Plan, which Doheny repeatedly backed – but the Board concealed the specific financial details of that model from stockholders in the Proxy.

58.     The Five-Year Downside Scenario that would eventually appear in Goldman's fairness opinion regarding the Acquisition was not a run-the-company, operative strategic plan.  It was purely manufactured to support the purported fairness of an undervalued sale to Komatsu. Tellingly, there is no indication that Joy Global *ever* provided its Five-Year Downside Scenario to Komatsu.  It was simply not a reliable picture of the Company.  While the Proxy does not say, it is reasonable to infer, however, that Joy Global did provide its Five-Year Growth Plan to Komatsu during due diligence.  The plan was in existence, it was time-tested, and management publicly and repeatedly backed that plan.

59.     The Five-Year Downside Scenario served absolutely no standalone business purpose. Indeed, Defendants concede this fact in the Proxy by stating that "***In connection with the merger***, Joy Global's management prepared the Joy Global Forecasts [the Five-Year Downside Scenario] for internal use and provided them to the Joy Global board, ***for the purposes of considering, analyzing and evaluating Joy Global's strategic and financial alternatives, including the merger***."

60.     The Five-Year Downside Scenario was simply incompatible with the Company's operative reality and then-current expectations. Misleadingly termed the "Joy Global Forecasts" in the Proxy, a screenshot of the Proxy's disclosure regarding the downside scenario is contained below:

### Summary of the Joy Global Forecasts
*(dollars in millions)*

| | Projected Fiscal Year | | | | | | |
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| Revenue | $ 2,370 | $ 2,468 | $ 2,987 | $ 3,645 | $ 3,777 | $ 4,205 |
| Adjusted EBITDA(1) | $ 207 | $ 232 | $ 355 | $ 508 | $ 573 | $ 708 |
| Unlevered Free Cash Flow(2) | $ 209 | $ 175 | $ 169 | $ 87 | $ 340 | $ 349 |
| Adjusted EPS(3) | $ 0.18 | $ 0.39 | $ 1.25 | $ 2.35 | $ 2.79 | $ 3.69 |

(1)    Earnings before interest, income, taxes and depreciation and amortization ("EBITDA") is a non-GAAP measure consisting of net income plus interest expense, provision for income taxes and depreciation and amortization. Adjusted EBITDA is EBITDA adjusted to exclude excess purchase accounting, restructuring costs, mark to market pension and other pension items, impairment charges, acquisition costs and other non-recurring items.

(2)    Unlevered Free Cash Flow is a non-GAAP measure consisting of Adjusted EBITDA, minus capital expenditures, plus or minus the decrease or increase in working capital, minus income taxes. Working capital consists of current assets minus current liabilities, excluding cash, income taxes payable, the current portion of long-term debt and discontinued operations.

(3)    Adjusted earnings per share is diluted earnings per share, adjusted to exclude excess purchase accounting, restructuring and related costs, mark to market pension and other pension items, impairment charges, acquisition costs, discontinued operations and discrete tax item.

61.     Recall that on March 16, 2016 – after the Five-Year Downside Scenario was created – Doheny's presentation indicated that management's true operational plan at the time resulted in a projected $4.7 billion in revenue for 2020 and $4.95 in EPS for 2020.

62.     The Five-Year Downside Scenario pictured above and disclosed to stockholders, however, contains a dramatically reduced $3.8 billion in revenue for 2020 and just $2.79 EPS for 2020. Indeed, the terminal year figures in 2021 disclosed in the Proxy ($4.2 billion revenue and $3.69 EPS) are still well below management's operational plan. As a result, the Proxy conveyed a false narrative regarding management's views as to the expected performance of the Company.

63.     The Five-Year Downside Scenario was misleading and does not reflect the Company's operative reality for an additional reason – it ignores the clear growth potential of Joy Global's direct services business segment.  The Five-Year Downside Scenario included slower growth of a number of items, including hard rock and industrial.  Most significantly, the Five-Year Downside Scenario reduced growth from services – which Joy Global management consistently touted as Joy Global's most significant growth driver.  Indeed, the Proxy's description of that downside case contains absolutely no emphasis on the crown jewel of Joy Global's growth platform: Direct Service Growth.  Likewise, the Five-Year Downside Scenario contained in the Proxy contains no line-item or other mention of Joy Global's direct services.  To be sure, it could be that some revenues from Joy Global's service growth are included in the Five-Year Downside Scenario, but defendants chose to conceal a divisional breakdown of the projections in order to avoid scrutiny of those lowball, manipulated projections.  In contrast, according to the Proxy, in the Five-Year Growth Plan presented at the March 6, 2016 meeting, "the sales growth over that period would be slightly higher in the hard rock and industrial market ***but significantly stronger in service products***," as compared to the downside scenario.

64.     The Five-Year Downside Scenario thus failed to capture the key aspect of Joy Global's future growth, which contradicts all of the following statements by Doheny over time:

- March 17, 2015, Doheny at a Bank of America Merrill Lynch Global Industrials & EU Autos Conference:

    ***Our strategy all starts with service.  Our brand, we're a service company***.  We're direct to our customers.  Again, we're in the mines.  We're directly connected, but we're also at the table.  What's quite interesting about our business, the major mining companies, even why I'm in here in London this week, meeting with the top mining customers right now, as they're solving not only today's problems, how we can get the equipment more efficient, more effective, but how can we help them in today's environment where commodities have taken a step down.

    *            *            *

    [L]et's talk about our cash generation.  ***And to talk about cash generation, we have to talk very simply why Joy is such a great cash generator.  And that's because the margins and that's because of our service model***.  Having the high margins and converting that into cash, we've been quite successful. . . .  ***It's our service model***. . . .

- June 4, 2016, Doheny on the Q2 2015 Earnings Call:

*Being close to our customers and providing them with technical expertise and service work is critical to our business and why we continue to invest regionally in our service facilities*. . . .

- June 11, 2016, Doheny at the William Blair Growth Stock Conference:

And we're focusing on leading and the products we produce, leading in the markets that we serve and leading with service.

*     *     *

And just assume go to the chase, we got a flat market in the next five years. ***How can we grow the business in a flat market? So first, we start with service, where we lead in the industry***. That's what differentiates us, we go direct to our customers, we're in the mines. . . .

*[W]e think we have a significant opportunity to grow our service business* . . . .

- September 17, 2015, Doheny at the Morgan Stanley Industrials Conference:

*In the backdrop, you see there is service. And that's who we are and what we do and the core of our business*.

*     *     *

But on the strategies is one driving our service, we're direct service model. We're building on that with our Joy branded consumables. We have Smart Services, a lifecycle management contracts. ***So we think we have, even in a down market, some significant service growth opportunities***.

- November 10, 2015, Doheny at the Robert W. Baird & Co. Industrial Conference:

First of all, we're focused on mining. We're all about mining. Our diversification, that we'll talk about, is to go into different forms of mining. ***But our vision is: how do we create this world-class service company that focuses on world-class products with the highest productivity and efficiency?***

*     *     *

This is our vision, . . . . ***It's not only the equipment that we have today, but where we're looking to go in the future. As you can see on the slide, the center-piece is service***. That's our service center where we're not only connected next to the mines, connected in person, but, as you can see in the cloud where we're taking our Smart Services, being connected to the mines electronically.

*     *     *

***How do we create growth in this flat market? . . . So we're focusing on service. How do we grow our service business? Investing into the mines, being next to them and helping them lower their cost. We're developing new service products***.

- December 16, 2015, Doheny on the Q4 2014 Earnings Call:

***Expanding our service business remains a strategic imperative*** and one in which we realized several successes during 2015.

$$\ast \qquad \ast \qquad \ast$$

*As we execute our service strategy and move more customers to lifecycle management programs, our new service product and JoySmart Solutions business will grow*.

$$\ast \qquad \ast \qquad \ast$$

In 2016, we will seek to continue to leverage investments made in our service infrastructure and new product development to gain market share. . . .

- March 3, 2016, Doheny on the Q1 2016 Earnings Call:

Despite the headwinds in our end markets, *we made good progress on our service products and consumables growth strategy*. We continue to introduce new consumable offerings for ground engagement tool to bits for continuous miners and now Joy branded wire rope for our electric rope shovel. The new service offerings are needed in this tough market to grow share potential per machine as we have to deal with fleet reductions and idling.

- March 4, 2016, Joy Global in its Form 10-Q for Q1 2016: "*Providing customers with highly differentiated equipment and service systems solutions to improve safety and lower their cost per ton is the core of our strategy*."

**Joy Global's Stock Price Rises and
the Board Agrees to the Acquisition**

65.    On June 14, 2016, Joy Global's CFO presented a "Company Update" at the 2016 Citi Industrials Conference. In that Update, Joy Global described the "Current Market Landscape" as "Cautious Signs of Improvement." The Company also noted that while commodities prices remained near multi-year lows, "***Recent positive movements in key commodity prices positive for our customers (increased cash flow)***." Joy Global described its own performance as, "***Cash Flow: Solid Across the Cycle***," while including charts through 2017 estimates of Unfunded Pension Liability and CAPEX (capital expenditures). The Company further explained: "***Strategies coupled with profitability and asset efficiency delivery solid cash flow across the cycle***" and touted its "***Strong liquidity and manageable debt maturity profile***."

66.    During this time, Joy Global's stock price increased. On June 1, 2016, Joy Global's stock price closed at $16.70 per share. Joy Global released its Q2 2016 earnings on June 2, 2016 and its price skyrocketed nearly 20% to close at $20.36 per share the same day. Joy Global's stock price continued to rise. On July 12, 2016, Joy Global's stock closed at $23.87 per share. On July 18,

2016, Joy Global's stock closed at $24.03 per share. The Board, however, shut out Joy Global's stockholders from any further upside just two days later.

67.     With Joy Global's stock price rising and its growth-plan intact, the Board agreed to an undervalued sale at just $28.30 per share on July 20, 2016. When accepting that price, the Board did not ask for a valuation on the Five-Year Growth Plan. This failure was particularly problematic in light of the unusually low premium on this transaction, a fact the Board was forced to concede. At a July 19, 2016 Board meeting, Komatsu's offer stood at $28.00 per share. The day prior, Joy Global's stock price closed at $24.03 per share. This represented a premium of 18.9%. The Board and its financial advisor, Goldman, noted that this was a "***low or relatively low premium***" and could "***complicate the announcement of any transaction and associated communications***." Goldman also warned the Board that the average one-day premium through July 2016 was 39.5% and the average premium over the past twelve years was 32.2%. The premium on Komatsu's offer was paltry in comparison. The following day, Komatsu nominally increased its price to just $28.30 per share. Joy Global's stock price closed at $23.55 per share on July 21, 2016. When Joy Global and Komatsu publicly announced the Acquisition on July 21, 2016, the premium over the July 20, 2016 closing price existed at just 20.2%, which is not materially different from the 18.9% premium that the Board and its financial advisors had just termed "*low*."

68.     The Board allowed its most conflicted member, Doheny, to conduct unsupervised pricing negotiations with Komatsu throughout the sale process. When Doheny stood to make more money by cashing out his golden parachute than with a standalone company, it is not surprising he was unwilling to conduct tougher negotiations, obtain a higher price, nor threaten to open the process to other bidders willing to pay more. Worse, Doheny scrapped the Five-Year Growth Plan in favor of a lower, unreasonable, and untenable Five-Year Downside Scenario for valuation purposes. Doing so ensured receipt of his $22.2 million golden parachute. And upon announcement of the Acquisition, Doheny did not state that the Company was failing or that it would be unable to meet its growth objectives. Rather, he stated that the Acquisition would further "our ability to lead the mining industry with game-changing technologies and best-in-class products."

**After Announcing the Acquisition, an Early, Uninformed Stockholder
Vote Takes Place, Stockholders Reject Doheny's Compensation,
and the Mining Industry Continues to Improve**

69.     As a result of the misleading Proxy, uninformed Joy Global stockholders voted in favor of the Acquisition on October 19, 2016.  As described below, the Proxy concealed the Five-Year Growth Plan from Joy Global stockholders.

70.     In contrast, however, the Proxy disclosed Doheny and his management team's Acquisition-related compensation.  The Proxy included the following proposal: "to approve, on an advisory (non-binding) basis, certain compensation that may be paid or become payable to the Company's named executive officers in connection with the merger."   For Doheny, that compensation included, *inter alia*:

- three times the sum of (a) Doheny's annual salary and (b) Doheny's highest possible annual target bonus, or *$5,840,100*; and

- a lump sum cash payment of *$760,596*.

71.     Doheny received *$6,600,969* in special cash payments upon consummation of the Acquisition as a result of his change-in-control agreement.  That payment was unrelated to his stock options or equity ownership.  From similar special payments, CFO James M. Sullivan received $2,219,711 in cash, Executive Vice President, General Counsel Sean D. Major received $1,772,313 in cash, and Executive Vice President, Human Resources Johaness S. Maritz received $1,401,979 in cash.

72.     In addition, Doheny received *$15,503,952* in cash upon consummation of the Acquisition as a result of his various equity awards, consisting of stock options, restricted share units, and performance share awards.  Doheny's interests were never aligned with the rest of Joy Global's stockholders.  First, his options, restricted share units, and performance share awards would have been locked up for years absent a buyout of the Company.  Second, even for those shares that were already vested, Doheny faced a significant liquidity discount if he attempted to sell his shares in the open market.  This liquidity discount is not a problem that Joy Global's public stockholders faced, as they already had relatively liquid investments.  Third, without the Acquisition, the vast majority of Doheny's performance shares were on track to be forfeited in light of the cyclical

downturn in Joy Global's stock price. Yet through the Acquisition, Doheny received a windfall $4,160,100 payment for those share awards.

73.     In light of the conflicting and exorbitant nature of such payments to Doheny, Joy Global stockholders voted against these payments. On October 19, 2016, Joy Global disclosed that over 47.6 million shares voted against the payments, while just 28.7 million shares voted in favor. Remarkably, however, because this particular vote was non-binding, the Board went ahead and paid Doheny these massive payments, in full, upon consummation of the Acquisition.

74.     After the vote, Joy Global's results continued to improve. When reporting FY2016 operating results on December 14, 2016, Doheny noted that "***In late fiscal year 2016, we saw the beginning of global commodity markets rebalancing as supply surpluses started to be absorbed and pricing improved from decade low levels. . . . Our team has once again delivered financial results in line with our expectations, with continued solid cash generation, cost reduction ahead of target and steady advancement of our growth strategies***." Again, when reporting earnings on March 2, 2017, a month prior to the close of the Acquisition, Doheny conceded that, "[o]ver the last several months we have seen further evidence of commodity markets rebalancing, which has helped improve commodity pricing. . . . ***These pricing improvements and increased production levels have strengthened cash flows for many mining companies***. This has led to increased rebuild activity in what is typically a seasonally slower fiscal first quarter." In fact, Joy Global's bookings increased to $615 million in the quarter ended January 17, 2017, up 12% from the prior year and service bookings increased to $524 million, up 21% from a year ago.

75.     Komatsu's stock skyrocketed since the announcement of its Joy Global Acquisition. The following chart represents Komatsu's stock price in the last 12 months. Note the increase between July 2016 (when Komatsu announced its Acquisition of Joy Global) to April 2017 (when Komatsu closed its Acquisition of Joy Global):



76.     Because the Board reached a deal based on the unreasonably low Five-Year Downside Scenario, however, Joy Global's stock was capped at $28.30 per share during this time and Joy Global stockholders were shut out from any additional upside.

**The Sale Process Was Flawed and the Acquisition**
**Price Does Not Provide a Reliable Indication of Value**

77.     Despite the existence of other potential acquirers, the Joy Global Board unreasonably decided against soliciting any other bidders in connection with the sale of Joy Global. This decision was particularly problematic given that the Acquisition involved what the Joy Global Board conceded was an unusually low premium – there was no blowout price to protect here. Indeed, Joy Global's stock price was increasing and, as alleged throughout this Complaint, even if Komatsu had walked, Joy Global's stock price was set to continue that rise. Joy Global prevented the reliable price discovery that might have been obtained in a broad sale process when it refused to contact a single additional potential buyer.

78.     Nothing prevented the Board from contacting another potential buyer. The Company was not acting under an exclusivity agreement with respect to Komatsu. Komatsu never threatened that it might walk if the Board opened up the sale process. And until bound by the Merger

- 25 -

Agreement, Joy Global was under no contractual restriction from simply contacting other interested acquirers, such as General Electric Company, Atlas Copco Group, Hitachi, or Caterpillar Inc., who had all expressed recent interest in acquisitions in the mining industry. Indeed, each of those entities had shown a track record for similar acquisition in the recent past. Yet the Board unreasonably contacted none of these entities before locking itself into the Acquisition via the Merger Agreement.

79. In addition, as noted above, the Board acted unreasonably throughout its discussions with Komatsu, including by allowing its most conflicted member, Doheny, to conduct unsupervised pricing negotiations with Komatsu throughout the process. When Doheny stood to make more money in cashing out his golden parachute than with a standalone company, it is not surprising he was unwilling to conduct tougher negotiations, obtain a higher price, or threaten to open the process to other bidders willing to pay more. The Outside Directors failed to supervise or become directly involved in Doheny's discussions with Komatsu. While this Complaint does not presently assert claims for breach of fiduciary duty under Delaware law, the full Board breached their situational fiduciary duties under "enhanced scrutiny" throughout the sale process, and Doheny breached his duty of loyalty, as described herein.

80. Rather than electing for a "go shop" period – as is common after announcing a sale where the company was not shopped – the Board agreed to preclusive deal protection devices that made it exceedingly difficult for other buyers to make a successful competing bid for the Company. These provisions, which prevented the emergence of competing bidders, include: (i) a no-shop clause that precludes the Company from communicating with or providing confidential Company information to potential competing bidders except under extremely limited circumstances; (ii) a matching rights provision that allows Komatsu to match any competing proposal; and (iii) a termination fee provision that required Joy Global to pay Komatsu $75 million in the event the Acquisition is terminated in favor of a superior proposal. The collective effect of these provisions chilled any possibility of a topping bid.

81. Also, as described above, the Joy Global Board failed to commission a fairness opinion that valued the Company's most reliable operational projections, thus severely undermining the Acquisition price of $28.30 per share. Finally, the Board retained a conflicted banker to bless the

- 26 -

fairness of the Acquisition price. For its services as a financial advisor, Goldman received a success fee of $28.5 million that was wholly contingent on the completion of the Acquisition. If Goldman did not offer a fairness opinion and the deal thus did not close, according to the Proxy, Goldman would have received nothing and walked away with a complete loss. Goldman was incentivized to effectuate an Acquisition at nearly any price, as opposed to no Acquisition at all.

**The Conflicted and Unfair Process Led to an Unfair Price**

82.     The Acquisition significantly undervalued Joy Global. As noted, the $28.30 per share merger consideration represented a one-day premium of just 20.2%, just over half of Goldman's observed average one-day premium as of July 20, 2016 of 39.5%. As also noted above, a senior analyst at Robert W. Baird & Co. Inc., observed that: "the value of the transaction, which boils down to ***$28.30*** (per share), effectively does not extract as much value as there should be for Joy's shareholders. In our view, something closer to $40, frankly above $40, would accomplish that. . . . [Joy Global] is one of the most valuable assets, pure play mining assets, available globally." Similarly, *Bloomberg* wrote that Komatsu was buying Joy Global "[o]n the cheap" by acquiring "Joy at almost a 50 percent discount to its five-year average. And now [Komatsu] has the benefit of at least some stabilization in commodity prices to give it confidence in a mining turnaround. Joy Global shares have recovered somewhat this year, but Komatsu is still getting a bargain. In other words, the timing probably couldn't have been better for Komatsu to strike its biggest deal yet." In addition, an analyst at Avondale Partners LLC set a price target for Joy Global stock of $30.00 per share on June 2, 2016. Moreover, Joy Global shares had traded as high as $65.36 per share on July 16, 2014, and most recently traded above the Acquisition consideration – at $28.63 per share – on July 23, 2015.

83.     As analysts observed, defendants unreasonably chose to sell a cyclical company at the low end of its cycle. Komatsu CEO Tetsuji Ohashi even boasted to reporters upon announcing the Acquisition that Komatsu took advantage of this cyclical industry slowdown and bought Joy Global at the bottom of the market: "'***The mining market is near the bottom now. Now is the good time (to do the acquisition)***.'" Demand for mining equipment had slowed from the commodity cycle's peak five years prior as China and other key markets softened. Over the long term, however, the mining

- 27 -

equipment business was projected to grow, driven by population growth and rapid urbanization around the world. Joy Global's markets were cyclical and recently had been challenged (which had impacted the price of Joy Global stock, which as noted above, traded at over $65 per share in mid-2014). Therefore, any proper valuation of Joy Global should consider where it was in the cycle, which was then near or at the bottom. At the time, there were signs of firming in the global commodities markets. Joy Global noted in its earnings release that its fiscal 2016 second quarter results were better than expected. Joy Global also noted that copper markets were stabilizing and both the iron ore and oil markets were improving. Coal, particularly in the United States, was challenged; however, metallurgical coal and the steel markets were expected to improve in 2017. Joy Global's improving backlog also signaled a bottoming process – Joy Global booked orders for a longwall system and parts for shovels operating in the growing Indian coal market and for two shovels to be used in the Canadian oil sands. As for the U.S. coal sector, restructuring and rationalization in supply resulted in a more profitable industry with an ability and willingness to invest in highly productive equipment.

84.     The consideration offered in the Acquisition did not adequately reflect the Company's prospects going forward or its synergistic value to Komatsu as a merger partner. By entering into the Acquisition, Komatsu was able to capture the value of Joy Global's business, at far less than its actual synergistic value to Komatsu. Joy Global's shareholders, on the other hand, did not share in these profits going forward, as this is a cash-out transaction that did not include any stock component for shareholders.

85.     The Acquisition allowed Komatsu to reap benefits that will not be shared by Joy Global's shareholders and unfairly deprived Joy Global's shareholders of the same. As a result of the Acquisition, Joy Global's shareholders were cashed out at a price that did not reflect their equity stake in the Company, all while Komatsu reaped the benefits of Joy Global's position as a global leader in its field. Goldman's financial analysis in support of the Acquisition was particularly flawed, as it was based on the Five-Year Downside Scenario, a set of downside projections that did not reflect the Company's operative reality. In addition, Goldman applied an unreasonably high

discount rate of 14.0% to 15.0%, and unjustifiably applied a terminal multiple range of just 8.0x to 9.0x, despite applying a multiple range of 11x to 17x after observing selected precedent transactions.

**The Materially Misleading Proxy**

86. In connection with the Acquisition, defendants filed and disseminated the materially false and misleading Proxy. The Proxy, which recommended that Joy Global's shareholders vote in favor of the Acquisition, omitted and misrepresented material information about the intrinsic value of the Company that made it more likely that Joy Global's public shareholders would be coerced and misled into voting in favor of the Acquisition without that material information regarding the critical decision they faced. Specifically, the Proxy omitted and/or misrepresented the material information set forth below in contravention of §§14(a) and 20(a) of the 1934 Act:

(a) The Proxy omitted specific financial projections contained in the "second scenario," as presented to the Board at the March 7, 2016 board meeting (or, the "Five-Year Growth Plan");

(b) The Proxy omitted specific five-year financial projections supporting the "Strategies, Creating Growth in a Down Market" slide that Doheny presented at the Bank of America Merrill Lynch 2016 Global Industrials & EU Autos Conference on March 16, 2016;

(c) The Proxy omitted specific five-year financial projections contained in the latest version, prior to March 7, 2016, of the "five-year plan on growth" and "five-year plan on operational strategies" that Doheny referenced September 3, 2015; and

(d) The Proxy omitted specific breakdown in projections on a divisional basis in the disclosed Five-Year Downside Scenario, given that Doheny's earlier presentations provided a divisional breakdown of incremental 2020 revenues: Direct Service Growth ($500 million), New Product Development ($200 million), China & High Growth Markets ($200 million), Hard Rock ($600 million);

(e) The Proxy presents a false-narrative, as described above, indicating that Doheny and his management team chose, purportedly in good faith, the Five-Year Downside Scenario, despite Doheny's repeated statements to the contrary; and

- 29 -

(f)     The Proxy falsely states that "The Joy Global board considered that the merger consideration was more favorable to Joy Global's stockholders than the potential value that would reasonably be expected to result from other alternatives reasonably available to Joy Global," when the Board did not view a discounted cash flow analysis on the Five-Year Growth Plan.

87.     Without full and fair disclosure of the material information, set forth above, shareholders should not have been asked to vote on the Acquisition.

88.     As explained above, this information was material to the decision of Joy Global shareholders on whether or not to vote in favor of the Acquisition.  When stockholders are forced to decide whether to accept a sum certain value in a cash-out merger, there is no more material information than management's estimates of the standalone corporation's future cash flows.  In such a situation, investors are concerned, perhaps above all else, with the expected corporate cash flows if the sale is not approved.  A common refrain throughout case law states that "projections are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  In the context of a corporate sale, a company's operational, run-the-company projections prepared before the acquirer's initial offer – thus untainted by the omnipresent specter of management conflict in a change-of-control transaction – take on a heightened importance.  When submitting the Acquisition to a stockholder vote here, however, the Joy Global Board deprived the Company's stockholders of management's most reasonable, reliable, and best expectations of Joy Global's future process.

89.     Had the Five-Year Growth Plan been numerically disclosed in the Proxy, Joy Global stockholders would not have been swayed by the unduly pessimistic sales pitch contained in the Proxy and would have realized the Acquisition undervalued Joy Global's future earnings potential.  Had the Five-Year Growth Plan been disclosed and accurately been presented as being reliable, Joy Global stockholders would not have voted in favor of the Acquisition.  But Doheny and the rest of the Board knew that.  So they concealed the Five-Year Growth Plan's reliability, achievability, and numerical projections from stockholders in the Proxy.

90.     Additionally, the Outside Directors allowed Doheny, who was patently conflicted, to oversee the preparation of the Five-Year Downside Scenario.  Moreover, the Outside Directors knew – or should have known – of the repeated public statements that Doheny was making in support of the Five-Year Growth Plan that were contradictory to the Five-Year Downside Scenario used to convince shareholders to vote in favor of the Merger.  Each Outside Director purportedly attended the March 7, 2016 Board meeting, where management presented an overview of the Five-Year Growth Plan; each Outside Director purportedly attended the June 6, 2016 Board meeting, where management presented the Five-Year Downside Scenario; and each Outside Director attended the July 20, 2016 Board meeting, where Goldman presented its Fairness Presentation valuing the Five-Year Downside Scenario.  And ultimately, each Outside Director is implicated in the following recommendations in the Proxy, which are purportedly supported by valuations based on the Five-Year Downside Scenario:  "The Joy Global board of directors has unanimously determined that the merger agreement, the merger and the other transactions contemplated by the merger agreement are advisable, fair to and in the best interests of Joy Global and its stockholders and has unanimously approved the merger agreement, the merger and the other transactions contemplated by the merger agreement. The Joy Global board of directors unanimously recommends that the stockholders of the Company vote (1) 'FOR' the proposal to adopt the merger agreement . . . ."

## CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this action individually and as a class action on behalf of all holders of Joy Global stock who were harmed by defendants' actions described above (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

92.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

93.     The Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, as of July 18, 2016, there were over 98 million shares of Joy Global common stock outstanding, held by hundreds, if not thousands, of beneficial holders.

94.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing and disseminating a false and misleading Proxy;

(b)     whether plaintiff and the other members of the Class have been damaged as a result of the conduct detailed herein;

(c)     whether the Five-Year Growth Plan was material and should have been disclosed to Joy Global stockholders;

(d)     whether the consideration payable in connection with the Acquisition to plaintiffs and the Class was unfair and inadequate; and

(e)     whether Joy Global's standalone value existed above the Acquisition price of $28.30 per share, which each Joy Global stockholder received upon consummation of the Acquisition.

95.     Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

96.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

97.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

98.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

99.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

- 32 -

# COUNT I

## For Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Joy Global

100.    Plaintiffs repeat and reallege each allegation set forth herein.

101.    The Individual Defendants and Joy Global disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and Joy Global.  It misrepresents and/or omits material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Acquisition, and the actual intrinsic value of the Company's assets.

103.    In disseminating the Proxy, the Individual Defendants and Joy Global made misleading statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company or as signatories to the Merger Agreement, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

104.    As stated herein, the Proxy contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder; the Proxy was an essential link in the consummation of the Acquisition.  The defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

105.    The written communications made by the defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.

106.    As a direct result of the defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, plaintiffs and the class were precluded both from exercising

their right to seek appraisal and were induced to vote their shares and accept inadequate consideration of $28.30 per share in connection with the Acquisition. The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition deprived plaintiffs and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Joy Global shares. At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning the process involved in selling Joy Global and Joy Global's true value (as reflected in, at a minimum, the Five-Year Growth Plan), which was far greater than the $28.30 per share that shareholders received. Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy defendants used to obtain shareholder approval of and thereby consummate the Acquisition, plaintiffs and the class have suffered damage and actual economic losses (*i.e.*, the difference between the price Joy Global shareholders received and Joy Global's true value at the time of the Acquisition) in an amount to be determined at trial.

107.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

108.    By reason of the misconduct detailed herein, the defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

109.    Plaintiffs repeat and reallege each allegation set forth herein.

110.    The Individual Defendants acted as controlling persons of Joy Global within the meaning of §20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Joy Global and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, the

- 34 -

Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements plaintiffs contend are false and misleading.

111.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contained the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.  They were thus directly involved in the making of this document.

113.    As set forth above, the Individual Defendants had the ability to and did exercise control over a person or persons who violated §14(a) and SEC Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Joy Global's shareholders were irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that the Proxy distributed by defendants to shareholders was materially false and misleading, in violation of Rule 14a-9 and §14(a) of the 1934 Act;

C.    Awarding plaintiffs and the members of the Class compensatory and/or rescissory damages against the defendants;

D.      Awarding plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

E.      Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand trial by jury on all issues so triable.

DATED:  April 26, 2017              ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                    RANDALL J. BARON
                                    DAVID T. WISSBROECKER
                                    DAVID A. KNOTTS


                                             *s/ David T. Wissbroecker*
                                    _____
                                         DAVID T. WISSBROECKER

                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101
                                    Telephone:  619/231-1058
                                    619/231-7423 (fax)

                                    BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
                                    PERETZ BRONSTEIN
                                    SHIMON YIFTACH
                                    60 East 42nd Street, Suite 4600
                                    New York, NY  10165
                                    Telephone:  212/697-6484
                                    212/697-7296 (fax)

                                    Lead Counsel for Lead Plaintiffs

                                    WAGNER LAW GROUP, S.C.
                                    K. SCOTT WAGNER (SBN 1004668)
                                    839 North Jefferson Street, Suite 400
                                    Milwaukee, WI  53202
                                    Telephone:  414/278-7000
                                    414/278-7590 (fax)
                                    ksw@wagner-lawgroup.com

                                    Local Counsel

                                    JOHNSON & WEAVER, LLP
                                    FRANK J. JOHNSON
                                    600 West Broadway, Suite 1540
                                    San Diego, CA  92101
                                    Telephone:  619/230-0063
                                    619/255-1856 (fax)

1258258_1

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Telephone: 212/802-1486
212/602-1592 (fax)

Additional Counsel for Plaintiffs

1258258_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 26, 2017.

*s/ David T. Wissbroecker*
DAVID T. WISSBROECKER

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: dwissbroecker@rgrdlaw.com

1258258_1

# Mailing Information for a Case 2:16-cv-01229-PP Duncan v. Joy Global Inc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael B Apfeld**
  mbapfeld@gklaw.com,bsweeney@gklaw.com

- **Philip C Babler**
  pcbabler@foley.com,pweisel@foley.com

- **Eugene Bykhovsky**
  eugene@byklaw.com

- **Kate E Gehl**
  kgehl@foley.com

- **Bryan B House**
  bhouse@foley.com,sulness@foley.com

- **Howard A Pollack**
  hpollack@gklaw.com,TRaymond@gklaw.com

- **Elissa J Preheim**
  elissa.preheim@aporter.com

- **Thomas L Shriner , Jr**
  tshriner@foley.com,kszyszko@foley.com

- **K Scott Wagner**
  ksw@wagner-lawgroup.com,amp@wagner-lawgroup.com,lse@wagner-lawgroup.com

- **Zachary R Willenbrink**
  zwillenbrink@gklaw.com,kthompson@gklaw.com

- **David T Wissbroecker**
  dwissbroecker@rgrdlaw.com,jaimem@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Peretz              Bronstein
Bronstein Gewirtz & Grossman LLC
60 E 42nd St - Ste 4600
```

New York, NY 10165

**Edward        M Gergosian**
Robbins Geller Rudman & Dowd LLP
655 W Broadway - Ste 1900
San Diego, CA 92101

**William        Scott Holleman**
Johnson & Weaver LLP
99 Madison Ave - 5th Fl
New York, NY 10016

**Frank        J Johnson**
Johnson & Weaver LLP
600 W Broadway - Ste 1540
San Diego, CA 92101

**Scott        B Schreiber**
Arnold & Porter LLP
601 Massachusetts Ave - NW
Washington, DC 20001

**Shimon        Yiftach**
Bronstein Gewirtz & Grossman LLC
60 E 42nd St - Ste 4600
New York, NY 10165

Case 2:16-cv-01229-PP   Filed 04/26/17   Page 41 of 41   Document 33